# RAYMOND GRADY SHOPE *v.* STATE OF MARYLAND

[No. 455, September Term, 1978.]

*Decided January 11, 1979.*

The cause was argued before MOORE, LOWE and WILNER, JJ.

*Stanley M. Dietz* for appellant.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Andrew Sonner,*

162

*State's Attorney for Montgomery County,* and *Thomas Cooke, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

— two sizes too small —

Lori Michelle O'Callaghan visually epitomized "what little girls are made of" — if one could have seen her beyond her bruises and welts. Raymond Grady Shope (who lived with Lori's mother) having caused those bruises and welts on six-year-old Lori, was convicted by a jury in the Montgomery County Circuit Court of child abuse.

At approximately 3:45 on the morning of May 12, 1977, a neighbor in an apartment under appellant's heard

> "someone very small running across the bedroom floor above me followed by a larger person, heavier person running behind the child and I heard banging around and I heard a man lecturing loudly, something to the effect, 'I have told you time and time again *not to take it there; you didn't* listen to me, you lied to me.' I heard what I thought was someone beating against something rather hard above me and then I heard what seemed to be like furniture being hurled across the room, hitting the wall and falling to the floor.
>
> . . .
>
> After I heard the beatings, I heard a small child screaming as if it was in pain. Not the kind of screaming that one would hear if they awakened in the middle of the night from a bad dream or something.
>
> . . .
>
> After I heard the child scream I heard what appeared to be something being thrown across the room, hitting the wall and falling to the floor."

Neighbors in the apartment above were also awakened by noise and heard crying and screaming during the melee which subsided at about 4:00 a.m. with "a child whining ... it sounded like a wounded animal."

Distraught with having lost at the race track from which he had returned with his family after midnight, appellant argued — and fought — with Lori's mother over "problems" that he had had with Lori. Whatever those problems may have been, his corrective measures brought on a police inquiry at the instance of his neighbors whose repose had been disturbed by Shope's choice of punishment.

Upon observing some of Lori's injuries — including contusions so severe they bled — the police requested appellant and Mrs. O'Callaghan to take Lori to a hospital. As a result of the medical examination and Lori's statement to an officer, Shope and Mrs. O'Callaghan were arrested.

Shope has appealed his subsequent conviction raising three issues, one of which compels reversal. An inculpatory statement was erroneously admitted. Finding, upon review of the record, sufficient evidence to sustain the conviction despite the preclusion of that statement, we will remand for retrial. *See Burks v. United States,* 437 U. S. 1, 57 L.Ed.2d 1 (1978); *Mackall v. State,* 283 Md. 100 (1978). To assist the court at retrial, we will address all issues raised on this appeal.

— sufficiency of the evidence —

Lori's testimony was, of itself, sufficient to provide evidence that Shope had caused her injuries by not only hitting and squeezing the petite child with his hands, but also using a belt proliferate with metal studded holes, which she identified. The additional testimony of visual and auditory observations by the neighbors, and by Mrs. O'Callaghan, amply supplemented the evidence from which inferences could have been drawn of the severity of the beating administered by Shope.

The "injuries" were vividly preserved by photographs introduced into evidence. Those pictures clearly indicate the result of "damages, harms or hurts" far in excess of

permissible corporal punishment. *See State v. Fabritz,* 276 Md. 416, 424 (1975). Furthermore, contrary to appellant's contention, there was medical testimony that indicated that some of the injuries had occurred within four hours of the medical examination on the morning of May 12, 1977 — "on or about" which date the indictment had charged the injuries had been inflicted. Appellant's sufficiency argument is specious.

— without unnecessary delay —

Following his arrest at 6:45 a.m., appellant was held at the Wheaton-Glenmont Police Station from his arrival at 7:50 a.m. until 7:00 p.m., when he was first taken before a commissioner and apprised of his charges pursuant to M.D.R. 723. Although actually interrogated only 45 minutes, during which he gave a formal, primarily exculpatory statement, he was kept handcuffed to a table in the interrogation room throughout the entire day. It was conceded at argument that the District Court sits from 9:00 a.m. until 5:00 p.m. daily at that location. It is also conceded that there is a commissioner available at the station 24 hours a day, 7 days a week.

Fifteen minutes before the police presented appellant to a commissioner, an officer overheard appellant make an incriminating admission to his common-law wife. The facts leading to that statement were described by the officer there present.[1]

> "Raymond Shope had made a request of me that he have certain medicine that Toni O'Callaghan had in her possession. I was very reluctant because the prescription did not have any name or identifying marks on it. I was very reluctant to give it to him. Our procedure is not to allow anything such as that

---

1. Although the officer stated that

"[p]rior to the statement they were both taken before the Commission of the Wheaton District Station,"

the record does not bear that sequence out. The chronology set forth by appellant is not questioned by the State.

to occur in passing it. I took the chance that they were being honest and frank with me. And rather than pass the medication to him, I allowed Raymond Shope to come into the room with Toni O'Callaghan.

At that time they had a limited conversation in my presence. The conversation was of several things that were said concerning the medication, et cetera. Other things were said, and one of the things Raymond Shope said, 'I did wrong and I have got to pay for it.' Toni Shope's response was, 'I did wrong too. I was there.'"

— the per se exclusion —

A preliminary motion to suppress that statement and a subsequent objection at trial, asserting that appellant had not been before a commissioner prior to making the statement, were both overruled. This was an error, but not one chargeable to the trial judge. It is one the blame for which we must assume. In May of 1977, we held in *Johnson v. State,* 36 Md. App. 162 (1977), that M.D.R. 723.a. was directory not mandatory. The rule directs that:

> "A defendant who is detained pursuant to an arrest shall be taken before a judicial officer without unnecessary delay and in no event later than the earlier of (1) 24 hours after arrest or (2) the first session of court after the defendant's arrest upon a warrant or, where an arrest has been made without a warrant, the first session of court after the charging document is filed. A charging document shall be filed promptly after arrest if not already filed."

We were wrong, and the judge below was misled by our misinterpretation.

On April 6, 1978 (the same day Shope was sentenced), we were reversed by the Court of Appeals (*Johnson v. State,* 282 Md. 314 (1978)), and told not only that M.D.R. 723.a. was mandatory, but also that the sanction for violating it was to

be the per se exclusion of any statement, voluntary or otherwise, obtained from an arrestee during a period of unnecessary delay in producing him before a judicial officer. 282 Md. at 328-329.

> "We therefore hold that any statement, voluntary or otherwise, obtained from an arrestee during a period of unnecessary delay in producing him before a judicial officer, thereby violating M.D.R. 723 a, is subject to exclusion when offered into evidence against the defendant as part of the prosecution's case-in-chief. A statement is automatically excludible if, at the time it was obtained from the defendant, he had not been produced before a commissioner for his initial appearance within the earlier of 24 hours after arrest or the first session of court following arrest, irrespective of the reason for the delay." *Id.* at 328-329, (emphasis added).[2]

The State does not dispute that there was a violation of the rule as interpreted by the Court of Appeals. It argues that *Johnson* is not retroactive and, even if it is, its holding is

---

2. The Court added:
   "Where, however, the delay in presentment falls within the outer limits established by M.D.R. 723 a, it is incumbent upon the trial court to determine whether the State has met its burden of showing that the delay was necessary under the circumstances of the particular case. Examples of necessary delay might include those required: 1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; 2) to determine whether a charging document should be issued accusing the arrestee of a crime; 3) to verify the commission of the crimes specified in the charging document; 4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; 5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may have been associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime. *Mallory v. United States,* 354 U. S. [449] at 454-55; Uniform Rule of Criminal Procedure 311; Model Code of Pre-Arraignment Procedure § 130.2(2)(b) (1975)." *Id.*

No reason was offered for the delay in presentment in this case, except routine processing of a statement of charges. We cannot believe that 11 hours and 15 minutes is reasonable for such routine administrative procedures. There is no other allegation of necessity for the delay.

irrelevant because the statement here was in the nature of a " 'blurt out' " type statement which it interprets as "exempted" by the Court of Appeals. Neither argument has merit.

— retroactivity —

Despite the carefully reasoned argument that *Johnson* is not retroactive when measured against the Supreme Court test in *Linkletter v. Walker,* 381 U. S. 618 (1965), that question is not an applicable issue in this case. Since *Johnson,* like *Linkletter,* addressed the retroactivity of the exclusionary sanction to be applied to a violation of a rule, rather than the retroactivity of the rule itself, the argument appeared at first blush most persuasive. It was given strength more recently by the Supreme Court's observation in *United States v. Peltier,* 422 U. S. 531 (1975).

"[I]n every case in which the Court has addressed the retroactivity problem in the context of the exclusionary rule, whereby concededly relevant evidence is excluded in order to enforce a constitutional guarantee that does not relate to the integrity of the factfinding process, the Court has concluded that any such new constitutional principle would be accorded only prospective application. Linkletter v Walker, 381 US 618, 14 L Ed 2d 601, 85 S Ct 1731 (1965); Johnson v New Jersey, 384 US 719, 16 L Ed 2d 882, 86 S Ct 1772 (1966); Stovall v Denno, supra [388 U. S. 293 (1967)]; Fuller v Alaska, 393 US 80, 21 L Ed 2d 212, 89 S Ct 61 (1968); Desist v United States, 394 US 244, 22 L Ed 2d 248, 89 S Ct 1030 (1969); Jenkins v Delaware, 395 US 213, 23 L Ed 2d 253, 89 S Ct 1677 (1969); Williams v United States, supra [401 U. S. 646 (1971)]; Hill v California, 401 US 797, 28 L Ed 2d 484, 91 S Ct 1106 (1971).

We think that these cases tell us a great deal about the nature of the exclusionary rule, as well as something about the nature of retroactivity analysis. Decisions of this Court applying the exclusionary

rule to unconstitutionally seized evidence have referred to 'the imperative of judicial integrity,' Elkins v United States, 364 US 206, 222, 4 L Ed 2d 1669, 80 S Ct 1437 (1960), although the Court has relied principally upon the deterrent purpose served by the exclusionary rule. See Mapp v Ohio, 367 US 643, 6 L Ed 2d 1081, 81 S Ct 1684, 84 ALR2d 933 (1961); Lee v Florida, 392 US 378, 20 L Ed 2d 1166, 88 S Ct 2096 (1968); see also United States v Calandra, 414 US 338, 38 L Ed 2d 561, 94 S Ct 613 (1974); Michigan v Tucker, 417 US 433, 41 L Ed 2d 182, 94 S Ct 2357 (1974). And see also Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U Chi L Rev 665, 668-672 (1970)." *United States v. Peltier,* 422 U. S. 531, 535-536 (footnote omitted).

But we note that even *Linkletter,* the foundation case that it is, begins by expressly limiting the retroactivity question it addressed as

"whether this requirement operates retrospectively upon cases *finally decided* . . . ." *Id.* at 619-620 (emphasis added).

The Court pointed out in note 5 at 622 that:

"By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed . . . ."

Since *Johnson* was decided on the same day Shope was sentenced, *Johnson's* retroactivity does not become an issue in this case. The fact that it is before us makes it too obvious for discussion that this case was not "finally decided" when *Johnson* was filed.

— pure prospectivity —

Equally obvious is the fact that *Johnson* was not intended to be purely prospective, *i.e.,* a ruling which "does not apply even to the parties before the court." *Linkletter, supra,* 381

U. S. at 621-622. The Court of Appeals reversed and remanded the *Johnson* case for application of its newly espoused sanction. That alone is indicative that the Court did not intend that it be applied purely prospectively.

But for that fact we saw substantial merit in the State's urging that we apply the reasoning of *Johnson v. New Jersey,* 384 U. S. 719 (1966). In that case, both *Escobedo v. Illinois,* 378 U. S. 478 (1964) and *Miranda v. Arizona,* 384 U. S. 436 (1966) were held to apply *prospectively only* because:

> "to upset all of the convictions still pending on direct appeal which were obtained in trials preceding Escobedo and Miranda would impose an unjustifiable burden on the administration of justice." 384 U. S. at 733.

Such persuasive reasoning relating so closely to the same issues of excluding improperly obtained statements is most appropriate, but we are bound by the Court of Appeals, and its intended application we cannot gainsay. We are compelled, therefore, to apply the *Johnson* per se sanction to this violation of M.D.R. 723.a.

### — threshold confessions —

Acknowledging sub silentio that the rule was violated, the State argues that the statement was a " 'blurt out' " type statement "apparently exempted . . . from the ambit of *Johnson* in the following passage of that opinion:

> 'We note also that a truly spontaneous 'threshold' confession or statement uttered at the time of arrest or shortly thereafter would not be excludible on the grounds that police *subsequently* failed to act diligently in complying with M.D.R. 723 a. In such cases there is manifestly no connection between the delay and the statement, and since police misconduct does not in any way contribute to the making of the confession, the exclusionary rule would logically not apply.' 282 Md. 329, (emphasis in original)."

The State's alternative argument is as specious as its original was beguiling. The quote upon which it relied set forth a " 'threshold' confession or statement uttered at the time of arrest. or shortly thereafter" as the *only* exemption from the rule. Twelve hours later is hardly "at the time of arrest or shortly thereafter."

— the "deluded instrument" —

Presumably because in explaining its reasoning for the "threshhold" exemption, the Court of Appeals noted that

> "[i]n such cases there is manifestly no connection between the delay and the statement, and since police misconduct does not in any way contribute to the making of the confession, the exclusionary rule would logically not apply", 282 Md. at 329,

the State contends that

> "[t]he statement in the present case was absolutely not the product of any police misconduct regarding the delay inasmuch as the statement was not elicited by the police."

Our review of the record does not conclude that the factual circumstances can be conclusively held to reflect that the "police misconduct does not in any way contribute to the making of the confession."

Appellant was arrested at 6:45 a.m. and his interrogation was concluded by a formal statement at 10:00 a.m. Whether the subsequent 9 hour failure to present him to a commissioner who was at all times available in the same building, was negligent or intentional is not material. It was certainly not "without unnecessary delay" and, consequently as a violation of the rule, was "police misconduct." The time span alone gives rise to a "but for" argument that the "police misconduct" did in *some* way contribute to the making of the confession and, consequently, was not envisioned by the court in *Johnson* as exempt.

If we add to that the circumstance of permitting the appellant to meet with his codefendant, Toni O'Callaghan, so

that she could provide a medicine which the officer declined to administer and the "coincidence" of the officer jotting down the inculpatory portions of the conversation, it would seem the delay and associated conduct appears to have contributed to the statement. That suspicion is punctuated by the "forthwith" presentation of appellant to the commissioner fifteen minutes after the inculpatory remark was recorded, but twelve hours after his arrest. The overt and unexplained violation of a procedural rule adopted to assure a constitutional right, coupled with the suspect circumstances, will not justify a finding that the law enforcement officials "believed in good faith that their *conduct* was in accordance with the law," precluding our holding that "the imperative of judicial integrity" was afforded. *See United States v. Peltier,* 422 U. S. at 536-539.

Even assuming the delay was intentionally contrived to elicit the culpatory remark, the sanction of suppressing the truth is hard to justify as proper punishment for the tardiness in formally apprising appellant why he was being held. In light of the completely voluntary nature of the admission of such despicably cruel conduct to a six-year-old child, the equal dispensation of procedural rights for technical rule violations is not always understandable. But justice, to be so, must be equally dispensed, not distributed selectively. Despite its appearance of burning the barn to get rid of the mice, the judgment must be reversed and the case remanded for retrial.

— the search —

Since another trial is imminent, we will respond (if but briefly) to the attack on the warrant to search the appellant's apartment. He does not question that there was ample probable cause, but argues that he was denied due process because the judge who signed it

> "did not carefully read it prior to approving and subscribing the warrant in that he did not consider one of the particularities of the search authorized by the warrant, the limitation that the search be conducted in the daytime. He merely skimmed

through the warrant and he paid no particular attention to the warrant's command to 'search forthwith'."

We do not find that the record discloses so casual a perusal as indicated by the appellant. Assuming we did, however, the fact remains that there *was* sufficient probable cause for the search, as verified upon our independent review. The remaining argument is one of little consequence as far as prejudice is concerned, and appears specious when approached as procedural due process as well.

The warrant was signed at 7:30 p.m., which appellant contends was still daylight. The search was concluded at 8:55, which appellant contends was not only after dark in violation of the warrant's mandate to search in the daylight, but violated the "forthwith" requirement as well. Neither of these "violations" is sufficient to cause the warrant to be defective or the search to have been improper. The difficulty the signing judge had in recalling that which he had read might suggest the advisability of retaining copies of such warrants and affidavits, Md. Rule 780 b., but it does not compel exclusion of the fruits of the search.

A disturbing procedure, acknowledged by the Montgomery County police in this case, also suggests the advisability of judges retaining copies. It was testified that pursuant to an unwritten departmental policy, after a judicial signature is obtained on a search warrant, it is returned to a police supervisor for his approval. The suspect mischief to which this policy gives rise is pointed up in this case by a handprinted interlineation on the warrant following the indication that the affidavit was attached thereto "AND MADE APART THEREOF." The judge who signed the warrant did not recall that insertion which he said he would have initialed as customary practice had it been there. He acknowledged that it is conceivable that it was inserted after he signed it. In this instance, the facial alteration was not material. It is, however, highly suspect.

The purpose of a judicial officer approving a warrant is to place an independent and objective official between the enforcement officers and the public for purposes of

ascertaining probable cause. The Montgomery County procedure smacks of reviewing the judicial intermediary as presumptively less than objective, and requiring a police overview for their own protection.

Whatever the reason for the procedure it should be stopped. It is highly suspect and permits abuse, causes delay, and casts a shadow over both the warrant and the subsequent search. In the case at bar that suspicion caused us to scrutinize with especial care, the probable cause, the execution of the warrant and the delay in the search as well as the search itself and the resultant seizures. If the proposed warrant and affidavit are to be reviewed by a supervisor, that review should precede the judicial execution of the warrant. *No* changes should be made or contemplated thereafter.

We found in this case: no prejudice that the sun had set before the search, no harm from the minimal delay, no effect upon the warrant by the interlineation and adequate probable cause for the warrant. On a closer case the suspect procedure might have tipped the scale.

> *Judgment reversed.*
> *Case remanded for new trial.*
> *Costs to be paid by Montgomery County.*